Velda MARKBY, as personal representative of the and Administratrix of the Estate of Violet L. Petsch, and as personal representative for Velda Markby and Mary Reeb, daughters of Violet L. Petsch, Appellants (Plaintiffs),

v.

ST. ANTHONY HOSPITAL SYSTEMS, a nonprofit Colorado corporation and John and Jane Does 1–100, Appellees (Defendants).

No. 5661.

Supreme Court of Wyoming.

July 9, 1982.

Rehearing Denied Aug. 3, 1982.

Bradley L. Booke and Michael L. Cooper (argued), Lander, for appellants.

Frank D. Neville (argued), Richard L. Williams and Patricia M. Baird of Williams, Porter, Day & Neville, P. C., Casper, for appellees.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This is an appeal from the dismissal of a complaint alleging wrongful death. The district court's action was premised upon a finding that it lacked personal jurisdiction over the defendant. Accordingly the only issue on appeal is whether the district court's conclusion was correct.

We will affirm.

On August 25, 1981, appellant, as the personal representative of Violet Petsch's estate, initiated a wrongful-death action against appellee. The complaint claimed that appellee had failed to properly care for Petsch while she had been a patient in appellee St. Anthony Hospital in Denver, Colorado. Specifically it was alleged that on August 12, 1979, Petsch had entered St. Anthony Hospital in Denver. At that time Petsch was seventy-two years old and in generally good health except for circulatory problems in her legs. Vascular surgery to remove obstructions from the femoral arteries was performed on August 21, 1979. Following the surgery, on the night of August 30, 1979, Petsch was still connected to an intravenous bottle through which she received medication and sedatives. Apparently that night hospital personnel negligently failed not only to raise the guardrail on Petsch's bed, but also to maintain an adequate watch over her. As a result, she disconnected the intravenous bottle and left her room. She was found at approximately 6:00 a.m. on August 31, 1979, lying unconscious in the hospital's sun room. It was determined that Petsch had suffered a subdural hematoma, presumably from a fall in which she hit her head. Though emergency surgery was performed, Petsch never recovered and her death in Riverton, Wyoming on January 29, 1981 resulted from the head injury.

Appellee made a special appearance on October 14, 1981 to move for the complaint's dismissal upon the basis of improper jurisdiction. An affidavit of appellee's executive vice president was attached in which it was asserted that appellee had not and did not do business in Wyoming, and furthermore, that all Petsch's treatment by appellee had occurred in Colorado.

Interrogatories prepared by appellant were answered by appellee on November 6, 1981. In her memorandum of points and authorities in opposition to the motion to dismiss, appellant outlined certain facts admitted by appellee in its answers to the interrogatories as follows:

"St. Anthony's admits that Violet Petsch, a Wyoming resident, was treated in its hospital in Denver, Colorado (Exhibit 'A' to Defendant's Motion to Dismiss). From January 1, 1981 to September 30, 1981, Defendant admits that fifty-seven other Wyoming patients spent a total of 545 days in its hospital and paid Defendant $35,241.00 in fees (Exhibit 'A' to Defendant's Answers to Plaintiff's Interrogatories). From January 1, 1980 to December 31, 1980, Defendant admits that two hundred seventy-nine patients spent 1,375 days in Defendant's hospital and paid it $674,093.00. (Id.). Defendant admits that Wyoming patients have been using its hospitals for many years. (Answer to Plaintiff's Interrogatory # 6).

"Defendant admits that it advertises in the yellow pages of various Wyoming telephone books and has been doing so for the last year. The advertisements relate to Defendant's Flight for Life program which is an air ambulance service operated by Defendant in the State of Wyoming (Answers 10 and 23 to Plaintiff's Interrogatories). It is undenied that the service charges a fee.

"Defendant admits that Wyoming doctors have referred patients to Defendant's hospitals (Answer to Plaintiff's Interrogatory # 14), and it does not deny that

Wyoming doctors have had telephonic communication with Defendant concerning those doctor's patients (Answer to Plaintiff's Interrogatory # 15).

"Defendant admits that it has cashed checks drawn on Wyoming banks (Answer to Plaintiff's Interrogatory # 18), and that is [it] has received money from the State of Wyoming and from Blue Cross of Wyoming for services rendered by Defendant to Wyoming patients (Answer to Plaintiff's Interrogatory # 26).

"Since 1973, Defendant admits that it has been operating an air ambulance service in the State of Wyoming taking patients from Wyoming to Colorado. The statistics for each year since 1973 are:

"1973—3
1974—1
1975—4
1976—9
1977—13
1978—14
1979—24
1980—24
1981—17 to date.
"(Answer to Plaintiff's Interrogatory # 19)."

These facts, appellant claimed, established that appellee had sufficient minimum contacts with the State of Wyoming to expose it to the jurisdiction of Wyoming state courts.

On January 20, 1982, the district court rejected appellant's argument and granted the motion to dismiss. Specifically, the court predicated its action upon a finding that it, as a Wyoming court, lacked in personam jurisdiction over the defendant to hear the case. On appeal from the dismissal, the question for us to decide is whether the district court was correct in its conclusion.

■ Section 5–1–107(a), W.S.1977 provides:

"(a) A Wyoming court may exercise jurisdiction on any basis not inconsistent with the Wyoming or United States constitution."

This statute has been held to have extended the jurisdiction of the Wyoming state courts to the constitutional permissible limit. *First Wyoming Bank, N. A., Rawlins v. Trans Mountain Sales & Leasing, Inc.,* Wyo., 602 P.2d 1219 (1979). In other words, the statute authorized the state courts of Wyoming to exercise personal jurisdiction over an individual or a business organization only so long as it would not offend or violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution.[1]

The United States Supreme Court has extensively discussed the limits of the Due Process Clause on state court jurisdiction over nonresidents. In *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945) and its progeny, the Court outlined the minimum contacts or substantial fairness test. This test established under what circumstances a state court could constitutionally exercise jurisdiction over nonresident defendants.

In *International Shoe Co.,* supra, the specific question was whether a nonresident corporation was subject to the jurisdiction of the Washington state courts. In that case the Court, after announcing the adoption of the minimum contacts test, described it as follows:

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. [Citations.] Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose

1. The Due Process Clause of the Fourteenth Amendment, United States Constitution, provides:

" * * * [N]or shall any State deprive any person of life, liberty, or property, without due process of law * * *."

of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations. [Citations.]

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue. [Citations.]" 326 U.S. at 319, 66 S.Ct. at 159–160.

The Supreme Court again discussed the test in *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). There it upheld California's jurisdiction over an insurance company even though the company's only contact with California was the mailing of an insurance contract into the state. In its opinion, the Court examined the development of the test and the purposes behind it:

"Since *Pennoyer v. Neff*, 95 U.S. 714 [24 L.Ed. 565], this Court has held that the Due Process Clause of the Fourteenth Amendment places some limit on the power of state courts to enter binding judgments against persons not served with process within their boundaries. But just where this line of limitation falls has been the subject of prolific controversy, particularly with respect to foreign corporations. In a continuing process of evolution this Court accepted and then abandoned 'consent,' 'doing business,' and 'presence' as the standard for measuring the extent of state judicial power over such corporations. [Citation.] More recently in *International Shoe Co. v. Washington*, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95], the Court decided that 'due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'.' Id., at 316 [66 S.Ct. at 158].

"Looking back over this long history of litigation a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents. In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." 355 U.S. at 222–223, 78 S.Ct. at 200–201.

The Court, noting California's interest in providing its residents a forum, found that allowing the insurance company to be sued in the state in which the insured lived and had signed the insurance agreement was not unfair.

Shortly after its decision in *McGee* the Court, in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), had occasion to point out that despite the modern age there were still viable limits on a state court's power to exercise personal jurisdiction over nonresidents. In that case Dora Donner, a Pennsylvania resident, established a trust which reserved to her income for life and stated that the remainder should be paid over to such persons as she appointed by either inter vivos or testamentary instrument. She executed the trust instrument in Delaware. That instrument named a Wilmington, Delaware trust company as trustee. Thereafter Donner left Pennsylvania and moved to Florida where, prior to her death, she executed an inter vivos power of appointment. When she died, litigation over the validity of the exe-

cution of the inter vivos power of appointment resulted in both Florida and Delaware. The question which arose and was presented to the United States Supreme Court concerned whether a state court in Florida had in personam jurisdiction over the trustee (the Wilmington, Delaware trust company) such that the Florida court could order to whom the trustee was to deliver the trust's corpus. After rejecting the notion that the Florida court had in rem jurisdiction over the corpus, the Supreme Court considered the question of whether it had in personam jurisdiction over the trustee.

" * * * Appellees' stronger argument is for in personam jurisdiction over the Delaware trustee. They urge that the circumstances of this case amount to sufficient affiliation with the State of Florida to empower its courts to exercise personal jurisdiction over this nonresident defendant. Principal reliance is placed upon *McGee v. International Life Ins. Co.*, 355 U.S. 220 [78 S.Ct. 1998, 2 L.Ed.2d 223]. In *McGee* the Court noted the trend of expanding personal jurisdiction over nonresidents. As technological progress has increased the flow of commerce between States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer v. Neff*, 95 U.S. 714 [24 L.Ed. 565], to the flexible standard of *International Shoe Co. v. Washington*, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95]. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. [Citation.] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States. How-

ever minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him. [Citation.]" 357 U.S. at 250–251, 78 S.Ct. at 1238.

The Court concluded that the trustee had no activities of its own in Florida. The fact that Donner had been in Florida when she executed the power of appointment did not give the courts there personal jurisdiction over the trustee.

Following Hanson a considerable amount of litigation was produced throughout the nation which raised the issue of a particular court's in personam jurisdiction and required minimum contact analysis. This court's first opportunity to apply the minimum contact test came in *Ford Motor Company v. Arguello*, Wyo., 382 P.2d 886 (1963). After noting the several Supreme Court cases discussed supra, the court in Arguello said:

"In any event, it seems clear to us that under the pronouncements made there emerges the general rule that so long as the activities of a foreign corporation are sufficiently qualitative in nature and extent reasonably to show 'minimal contacts' with the state and state law on the subject is justly construed and applied to reach those activities for jurisdictional purposes under 'traditional notions of fair play and substantial justice,' all demands of due process are satisfied." 382 P.2d at 895.

The court then noted the substantial activities Ford Motor Company maintained in Wyoming. Following that discussion the court continued:

"In conjunction therewith and in disposing of Ford's contention, we have also considered other pertinent factors, such as: the interest of this state in providing a forum for its residents; the relative availability of evidence; the relative burden of defense and prosecution in Wyo-

ming rather than at some other place; the ease of access to some alternative forum; and the extent to which the cause of action arises out of Ford's local activities.

"In view of the foregoing and in view of the broadened concept of in personam jurisdiction of the state under the due process clause of the Federal Constitution, it seems clear that the record here was ample to permit the trial court to find and conclude, as it did, that the activities of Ford in this state were, in nature and extent, sufficient to satisfy federal requirements with respect to the matter." 382 P.2d at 895.

In *First Wyoming Bank, N. A., Rawlins v. Trans Mountain Sales & Leasing, Inc.,* supra, this court once again used the minimum contact analysis to decide whether the exercise of personal jurisdiction was permissible. There this court decided that Colorado residents who had guaranteed a loan from a Wyoming bank to a Colorado corporation were subject to suit in Wyoming in connection with the loan guarantee. In the course of its opinion this court cited approvingly the following language from the Oregon Supreme Court which attempted to delineate more clearly what constitutes minimum contacts:

" * * * [T]hree criteria can be said to define the present outer limits of in personam jurisdiction based on a single act: First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. [Citation.]" *State ex rel. White Lumber Sales, Inc. v. Sulmonetti,* 252 Or. 121, 448 P.2d 571, 574 (1968).

■ We believe that these, as factors along with the considerations listed in *Ar-*

*guello,* should be used in determining whether a state court may exercise personal jurisdiction over a nonresident defendant. Specifically, for the purpose of disposing of the appeal now before us, we hold the second criterion—a nexus between the contact with the forum state and the cause of action, to be a dispositive factor. Though some federal courts have disregarded that as a requirement (*Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 494 (5th Cir. 1974)), we believe it is implicitly mandated by the United States Supreme Court's discussions noted previously and by its most recent pronouncement in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). There it was said:

"The protection against inconvenient litigation is typically described in terms of 'reasonableness' or 'fairness.' We have said that the defendant's contacts with the forum State must be such that maintenance of the suit 'does not offend "traditional notions of fair play and substantial justice." ' *International Shoe Co. v. Washington,* supra, [326 U.S.] at 316 [66 S.Ct. at 158], quoting *Milliken v. Meyer,* 311 U.S. 457, 463 [61 S.Ct. 339, 342, 85 L.Ed. 278] (1940). The relationship between the defendant and the forum must be such that it is 'reasonable * * * to require the corporation to defend the particular suit which is brought there.' 326 U.S., at 317 [66 S.Ct. at 159]. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, [citation]; the plaintiff's interest in obtaining convenient and effective relief, [citation], at least when that interest is not adequately protected by the plaintiff's power to choose the forum, [citation]; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, [citation]." 444 U.S. at 292, 100 S.Ct. at 564.

But, it went on to observe that there were still limits on a state court's exercise of jurisdiction. Principles of fairness and reasonableness necessitate the continued vitality of territorial limitations.

"Thus, the Due Process Clause 'does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.' [Citation.] Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment. [Citation.]" 444 U.S. at 294, 100 S.Ct. at 565–566.

The second criteria, requiring consideration of the nexus, as a factor acknowledges and encompasses that territorial limitation. Some courts have held that the nexus between the defendant's contacts with the forum and the cause of action must exist. *Siskind v. Villa Foundation for Education, Inc.*, Tex.App., 624 S.W.2d 803 (1981); *Lumber Mart, Inc. v. Haas International Sales and Service, Inc.*, N.D., 269 N.W.2d 83 (1978); *Van Schaack and Company v. District Court, Eighteenth Judicial District*, 189 Colo. 145, 538 P.2d 425 (1975); *Proctor & Schwartz, Inc. v. Cleveland Lumber Company*, 228 Pa.Super. 12, 323 A.2d 11 (1974); *Thompson v. Ecological Science Corporation*, 421 F.2d 467 (8th Cir. 1970); *Pardo v. Wilson Line of Washington, Inc.*, 414 F.2d 1145 (D.C.Cir.1969). This list is by no means exhaustive but is enough to demonstrate that nexus is an important factor for consideration, though not always controlling in that the consequences must result in fairness to the defendant.

In applying the three-part test to the facts of this case, we first observe that appellee's only activity in Wyoming for which it purposely availed itself of Wyoming was its air ambulance service. In connection therewith, it placed advertisements in the yellow pages of various Wyoming telephone directories. These ads were limited to the air ambulance service. However, there is nothing in the record which shows that the cause of action arose as a consequence of its air ambulance service. No suggestion was made that the decedent went to appellee's hospital because of the ambulance service. There is nothing in the record to show a nexus between appellee's single activity in Wyoming and the cause of action in this case.

We must further point out that, in connection with the considerations listed in *Arguello*, supra, the record indicates an action has also been filed in Colorado. We have no reason to believe that Colorado will refuse to hear the case and leave appellant without a forum. Also, it appears that, since all the wrongful conduct, which is alleged, occurred in Colorado, it is the more convenient and logical forum. There are no special fairness considerations which would compel us to provide a forum. Accordingly, we must agree with the district court's decision to dismiss.

It may be well to also observe in passing that parts of Wyoming are within the trade areas of out-of-state metropolitan centers, i.e., Denver, Colorado; Salt Lake City, Utah; Billings, Montana; Scottsbluff, Nebraska; and Rapid City, South Dakota. Wyoming residents voluntarily go to those areas to shop for merchandise and services and the entire transaction takes place there. Were we to hold otherwise than we do, we would be encouraging litigation in this state which would do a disservice to the residents of those other states. This observation does not mean that we foreclose all litigation in this state against nonresidents, but it is a warning that each case must be weighed in the light of the factors we have here reviewed.

Affirmed.