**EASTRIDGE DEVELOPMENT COMPANY, Plaintiff–Appellee and Cross Appellant,**

v.

**HALPERT ASSOCIATES, INC. and Professional Service Industries, Inc., Defendant–Appellants and Cross Appellees.**

**Nos. 85–2512, 85–2575.**

United States Court of Appeals, Tenth Circuit.

Aug. 1, 1988.

Jeffrey C. Brinkerhoff (Mark W. Gifford, with him on the brief), Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo., for Eastridge Development Co.

Cameron S. Walker, Schwartz, Bon, McCrary & Walker, Casper, Wyo., and William D. Lyman, Oak Brook, Ill., for Halpert Associates, Inc. and Professional Service Industries.

Before SEYMOUR and ANDERSON, Circuit Judges, and BROWN, Senior District Judge.[*]

* The Honorable Wesley E. Brown, Senior District Judge, District of Kansas, sitting by designation.

WESLEY E. BROWN, Senior District Judge.

This appeal arises out of the construction of a shopping mall in Casper, Wyoming, known as the Eastridge Mall. The plaintiff, Eastridge Development Company (hereafter "Eastridge") filed suit to collect damages for professional negligence by two engineering firms which had done soil studies of the site prior to construction. One firm, The Empire Laboratories, did a preliminary study for Eastridge's predecessor in interest, the Price Development Company. The second firm, the defendant, Halpert Associates, (hereafter "Halpert") did a second study for Westcor Properties, the actual developer of the shopping center. The third defendant, Professional Service Industries (hereafter "PSI") was later joined as a defendant as the parent holding company of, and alleged alter ego of, Halpert Associates. Halpert filed for bankruptcy just prior to trial. The defendant, The Empire Laboratories, settled the case before trial for the sum of $15,000, and it is no longer a party to these proceedings.

At trial before a jury, Eastridge presented evidence to support its claim that because of negligent engineering tests and reports, it sustained various damages due to water seepage at the construction site. The jury returned a verdict in favor of Eastridge and judgment was entered against both defendants, Halpert and PSI, in the sum of $208,000, plus interest.

All parties have appealed, presenting issues involving the admission of evidence, the sufficiency of the evidence, the instructions, the impact of the statute of limitations, the denial of a motion to bifurcate the trial, the question of *in personam* jurisdiction; the alleged "amendment" of the verdict, the merits of plaintiff's claim for punitive damages, and the effect of the $15,000 pre-trial settlement by the Empire Laboratories.

In order to discuss the various issues raised on appeal it is first necessary to review the proceedings in the district court which led to this appeal.

Eastridge filed its original complaint on September 16, 1983 against two defendants, Halpert and Empire Laboratories, seeking damages for negligence in their preparation of the two engineering reports. The damages sought were the difference between the cost of correcting ground water problems which occurred on the site during construction, and the cost to correct those same problems, had the potential problem been disclosed in the reports.

The evidence was that in 1978 Eastridge's predecessor, Price Development Company, began preliminary plans to develop the Eastridge Mall and retained Empire to draw up a soils and ground water profile for the mall site, which at that time was undeveloped prairie land. Empire drilled 30 test holes at locations throughout the site, but only one of those test holes was in the vicinity of what was called the "detention basin", where the water problem later developed. Empire reported that no unusual ground water problems would be encountered at the site.

When Westcor took over the development, the defendant Halpert was retained to perform more comprehenisve soil testing at the site. Halpert performed additional borings, but did not check the area of the detention basin. It appears that Halpert relied upon the data obtained by Empire, and incorporated the Empire test results into its report which Halpert eventually rendered on December 28, 1979. The Halpert report concluded that "no unusual problems as regards ground water should be expected."

A non-jury trial was initially set to commence on October 15, 1984 against the two defendants, but Empire settled for a $15,000 payment, and was dismissed from the case. Halpert filed for bankruptcy and the case was removed from the trial calendar.

By leave of court, Eastridge twice amended its complaint to assert a claim against PSI, claiming that PSI was liable for Halpert's actions as its alter ego. In this connection, Eastridge claimed that PSI had concealed the extent of its ownership and control of Halpert, that it had used Halpert solely for its own purposes, stripping it of its assets, all in an attempt to hinder and defraud Eastridge in its pursuit

of damages from Halpert. Eastridge's amended complaints were filed on October 10, 1984, and on April 14, 1985.

PSI demanded a jury trial. The stay in bankruptcy was lifted, and jury trial proceeded on May 6th against both Halpert and PSI.

Prior to trial, PSI twice moved for dismissal of the complaint because of absence of *in personam* jurisdiction. These motions were denied. Also prior to trial, PSI moved to bifurcate the trial of the cases against Halpert and PSI to avoid prejudice. This motion was denied without hearing on May 3, 1985.

At trial, Eastridge prosecuted different claims against Halpert and PSI. The case against Halpert focused upon its negligence in failing to investigate and report on the ground water condition at the mall site. The case against PSI centered upon its conduct in controlling and manipulating Halpert's affairs so as to drain its assets, leaving Halpert as a bankrupt, uninsured, judgment-proof shell.

Under its second amended complaint, Eastridge also sought punitive damages from PSI for its alleged willful and wanton manipulation and misuse of Halpert. The trial court refused to receive evidence, or to instruct on the issue of punitive damages.

At trial, one witness testified that it had cost $286,905.00 to deal with the ground water problems on the site, and that it was anticipated that it would cost another $23,200 more to fully correct the problem. The witness estimated that if the ground water problem had been known in advance, it could have been corrected at a cost of only $30,000 to $50,000.

During the trial, Halpert and PSI moved for directed verdicts at the close of the plaintiff's case, and at the close of all of the evidence. These motions were denied.

On May 14, 1985, the jury returned a verdict in favor of Eastridge and against both defendants, in the sum of $208,000. The jury found that Eastridge was 20% negligent, Halpert 80% negligent, and that the Empire Laboratories, which had settled out of the case, was *not* negligent.

Halpert and PSI filed combined motions for Judgment N.O.V., for New Trial, and for Amendment of the Judgment. All of these motions were denied without hearing on September 9, 1985, and these appeals followed.

Other aspects of the case will be discussed in greater detail in the course of this opinion.

*Jurisdiction.*

PSI contends that the plaintiff failed to meet its burden of proof that the Court had *in personam jurisdiction* over PSI. In this connection, PSI contends that "(o)ther than the work in Wyoming, performed by Halpert for Westcor some years prior to P.S.I.'s having any involvement with Halpert, P.S.I. had no contact with the State of Wyoming prior to this litigation." (Appellee Brief p. 34). In support of this statement, PSI cites the Affidavit of Robert K. Pfister, an officer of the corporation, filed with the District Court on October 19, 1984. (Vol. L Record, Dkt. 99).

■ According to this affidavit, we are informed that PSI is a Delaware corporation, with its principal place of business in Oak Brook, Illinois; that it acquired all of the capital stock of Halpert Associates on December 1, 1981, pursuant to an agreement dated November 5, 1981; that Halpert was not merged into PSI, but remained a separate corporation after its acquisition by PSI; that at the time PSI acquired Halpert, it had minimal assets consisting of office furniture, equipment, and two trucks; that these assets were maintained on Halpert's books until December, 1983 when they were acquired by PSI for book value; that Halpert consistently lost money from its operations after its acquisition by PSI; that PSI carried Halpert's operations financially, until it decided to stop supporting Halpert and to discontinue its business in March, 1983; that all transactions between Halpert and PSI were conducted in the Detroit, Michigan area and in Oak Brook, Illinois; that Mr. Halpert of Halpert made three or four business trips to Wyoming, all prior to the transfer of ownership to PSI; that the soil borings in question were performed during

one of these trips in November, 1979; and that apart from this neither PSI nor any of its wholly-owned subsidiaries is or has ever been incorporated in Wyoming or qualified to do business in Wyoming, transacted any business in Wyoming, supplied goods or services to persons or businesses in that state, owned property or "had any contacts with persons in the State of Wyoming" ... "employed any person in the State of Wyoming for business purposes with the exception of legal counsel appearing on its behalf in this case", or had any "contact, business or otherwise," with the State of Wyoming. In this Affidavit, Mr. Pfister provided financial statements of Halpert to the court for the years 1982 and 1983, representing that they were "true and accurate copies" of said statements, prepared as a result of an audit, and Pfister swore that he had "no reason to believe that they do not truly and accurately represent the financial conditions of Halpert on the dates stated thereon...."

At trial, plaintiff presented evidence which tended to prove that Mr. Pfister's Affidavit was false in several material respects. From this evidence, the jury was entitled to find that after PSI acquired 100% ownership of Halpert it immediately began its absolute domination of its subsidiary. At the time of acquisition, Halpert Associates had a positive net worth of approximately $60,000 and also had professional liability insurance. After the acquisition, PSI cancelled the insurance, and assumed all responsibility and control over Halpert's financial matters and legal problems. All of Halpert's revenues were channeled directly to PSI, and expenses were paid by PSI. In December, 1982, PSI posted a $300,000 capital contribution to Halpert in preparation for merging Halpert into PSI. In early 1983, PSI learned that Eastridge had a potential negligence claim against Halpert. The jury was entitled to find that PSI then began to perpetuate a fraud upon Eastridge by manufacturing a balance sheet which did not reflect the capital contribution, and sending this to

Eastridge counsel in Wyoming in March, 1983. The jury could find that Mr. Pfister arranged for this with the express purpose of convincing Eastridge that Halpert was insolvent, in order to discourage litigation on the malpractice claim. It appears that the capital contribution entry was not reversed on the books until PSI was served with the Summons and Complaint in this action in September, 1983.[1]

Apart from other instances of PSI's attempts to hide its relationship to, and control of, Halpert from plaintiff and the court, which evidence will be discussed, *infra*, we find that the testimony of J. Neville Hargrave–Thomas concerning his activities on behalf of PSI establishes that the trial court properly assumed *in personam jurisdiction* over the defendant PSI.

In 1957, PSI had bought the stock of Michigan Testing Engineers, a company owned by Mr. Hargrave–Thomas. Thereafter, he became a Vice–President of PSI, and was present at the meeting which led to the acquisition of Halpert by PSI in November, 1981. He testified that early in 1982, Mr. Halpert received a letter from the Wyoming developers of the Eastridge Mall, indicating possible legal problems connected with the soil report. Mr. Hargrave–Thomas discussed the Wyoming job with Mr. Halpert, and then turned the letter over to Mr. Pfister of PSI.

In August or September, 1982, Mr. Hargrave–Thomas went to Wyoming to visit the Eastridge site in Casper, and to invesitgate the problems which had been mentioned in letters from the developers. At the time he went to Casper, he was not an employee of Halpert, and he did not go as an employee of Halpert. Mr. Pfister, Vice–President of PSI told him to go out and investigate the complaints. He prepared a report, which recognized that there was potential liability, and gave this report to Mr. Pfister.

It also appears that from the beginning of this litigation, and prior to the time that

---

1. PSI was not joined as a defendant until September, 1983. No actual cash contribution was made to Halpert—the contribution to capital resulted from "forgiveness" of an indebtedness to PSI which appeared on the books and records of the company.

PSI was joined as a defendant, Mr. Hargrave–Thomas, as an employee of PSI, accompanied defendant's counsel for depositions taken in Wyoming and other sections of the country. (Testimony of Hargrave–Thomas, Vol. IV of Trial Transcript, (Vol. VI of Record of Appeal)).

Mr. Hargrave–Thomas did not become an officer of Halpert Associates until March 20, 1983, at which time he also continued as an employee and officer of PSI. At trial he stated his position in this manner (Vol. IV Trial Transcript, p. 56):

"Historically I am a vice president of all the subsidiaries of Professional Services Industries, because I am intimately involved with each one of them.

"So I wear various hats, although there is only really one hat."

*In personam jurisdiction* exists in a Federal district court to the extent permitted by state law. *Shanks v. Westland Equipment and Parts Co.*, 668 F.2d 1165, 1167 (10th Cir.1982). Wyoming has adopted a long arm statute which incorporates state and federal constitutional standards, permitting courts to assert jurisdiction to the extent permitted by due process. Wyoming Statutes, Sec. 5–1–107 (1977). *Markby v. St. Anthony Hosp. Systems*, 647 P.2d 1068 (Wyo.1982); *Anderson v. Perry*, 667 P.2d 1155 (Wyo.1983), and see *Shanks v. Westland Equipment and Parts Company, supra,* in which this Court reviewed the limits of Wyoming *in personam jurisdiction.*

Apart from the status of PSI as the alter ego of Halpert Associates, the evidence established that PSI was transacting business in the State of Wyoming on its own account, as well as attempting to insulate Halpert's assets and equity from exposure to liability which might result from this suit. There was evidence that long before the suit was filed, PSI set upon a course of conduct intended to deceive and defraud plaintiff in the operation of its business in Wyoming. PSI caused false financial statements to be made and sent into the state of Wyoming for the purpose of inducing plaintiff to give up legal rights it had arising from work on the Eastridge Mall in Cheyenne. PSI agents entered the forum under the guise of defending the case for Halpert, while actually attempting to hide and protect its own interests in the case. This conduct even included the filing of false affidavits which were intended to influence the action of the District Court sitting in Wyoming.[2]

In this instance, PSI purposely availed itself of the privilege of acting for its own interests in the State of Wyoming, and those activities caused important consequences in that state. PSI's contact with the forum state was sufficient to make exercise of *in personam* jurisdiction reasonable, and consistent with due process.

*Causation.*

In this professional malpractice case, defendants contend that plaintiff's proof of causation and damages fell short of that required to sustain the verdict. In this connection, defendants contend that plaintiff's design personnel did not rely upon the Halpert report; that nothing would have been done in a different manner had the potential for ground water been disclosed; that some of the expenses claimed were not incurred to dry up the detention basin; that no one testified that major expense items would not have been incurred in any event, had the report disclosed the ground water problem; and there was no evidence as to whether or not there was ground water present at the site when Halpert did its study.

The Halpert report stated unequivocally that " ... no unusual problems as regards ground water should be expected ...", and that "... ground water will not be a factor in the design or construction of the proposed development." (Trial Transcript Vol. III, pp. 26–28).

The evidence established that ground water was in fact a significant factor in the construction of Eastridge Mall.

Mr. Krugly, the developer of Eastridge, testified that he did rely upon the report to

2. The District Court believed that perjury had been committed in connection with affidavits which had been filed with the Court. (Vol. V Trial Transcript p. 135).

accurately reflect the ground water conditions at the site. Plaintiff presented extensive testimony concerning the damages it sustained as a result of the misleading report. (Trial Transcript Vol. I, p. 56 and pp. 61–97). Defendants presented evidence to rebut this type of testimony, so a classic jury question was presented on the issues of causation and the extent of damages proximately resulting from professional malpractice. The jury is the sole judge of the weight of the evidence, and the credibility of the witnesses. The verdict was supported by the evidence, and the jury's finding will be upheld.

*The Westcor–Halpert Letter—Limitation of Liability*

Defendants contend that the Court erred in refusing to permit defendants to introduce Exhibit Z–50, which was a letter dated December 11, 1979 from Westcor to Mr. Speedie of Halpert which specifically stated that a Halpert Fee and Rate Schedule attached to the letter would govern the project. One of the terms of the Schedule was the limitation of professional liability to the sum of $50,000 or the amount of the fee paid, whichever amount was greater.

█ Eastridge prepared for trial upon the understanding that there was no written agreement limiting Halpert's professional liability. All through discovery and through the second day of trial defendants represented that there was no signed contract between the parties. Mr. Speedie, Halpert's former employee who wrote the report for Halpert, repeatedly denied that there was any written contract. It appears that there had been previous contact between Westcor and Halpert which included a similar Fee and Rate Schedule limiting liability and defendants intended to establish that Halpert's work on the Eastridge site was done pursuant to this "course of dealing" between Westcor and Halpert (Vol. XI Record, Transcript, May 8, 1986, p. 5).

Late in the evening of May 7th James Speedie discovered a copy of a letter from Westcor dated December 11, 1979, which included an attached fee and rate schedule limiting liability for professional negligence. The request to introduce this letter was denied by the court, upon a finding that there was no showing that the letter could not have been discovered before, had defendants shown due diligence. The letter had not been listed by defendants in its list of exhibits, and the court ruled that it would surprise and cause prejudice to plaintiff. Defendants made a second offer of proof on this exhibit. The court then ruled that Z–50 would not be received, and that James Speedie would not be permitted to testify to anything relating to Z–50 which would in any way contradict his prior deposition testimony to the effect that there was no written contract between the parties. (Vol. III Trial Transcript, pp. 110–111).

Defendants contend that the action of the trial court in excluding Exhibit Z–50 was "manifestly unjust and constituted an abuse of discretion," citing the decision of this Circuit in *Smith v. Ford Motor Company*, 626 F.2d 784, 797 (10th Cir.1980) cert. den. 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981), which discussed the factors for determining whether a district court has abused its discretion in excluding evidence not specified in the pretrial order:

> "In *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–905 (3d Cir.1977), the court enunciated a series of factors which should be considered in determining whether a district court has abused its discretion in excluding, or in our case allowing, testimony not specified in the pre-trial order:
>
> '(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.' ..."

(626 F.2d at 797).

Tested by these factors, it is clear that plaintiff was surprised by the production of a document which defendants had declared

did not exist. It had proceeded to trial on that understanding, and had the Exhibit been received at trial, Eastridge would clearly have been prejudiced. Eastridge would have had no opportunity to test the authenticity of a document "discovered" after trial began, and it could not have been prepared to cross examine defendants' witnesses or to call witnesses of its own on that issue. Only a major continuance of the trial and a reopening of the discovery process would have allowed plaintiff the time to depose witnesses and inquire into the authenticity and purported effect of the Halpert fee schedule attached to this letter. As to the factor of "bad faith" or "willfulness"—such conduct would not of course be a prerequisite for excluding evidence. We do note that the trial court found that defendants had certainly not exercised "due diligence" in complying with discovery processes prior to trial. And finally we note, this was not a case of mere inadvertence or negligence in failing to list an exhibit upon a pre-trial Exhibit List. In this case, Mr. Speedie, and the defendants had affirmatively claimed throughout discovery that the proposed exhibit did not in fact exist. Under the circumstances of this case, the trial court correctly excluded Exhibit Z–50 and this exclusion was not an abuse of discretion.[3]

*Halpert as the Alter Ego of PSI.*

Defendants contend that the instructions pertaining to the elements necessary to disregard the separate corporate entity of Halpert were erroneous in that they misstated the law of Wyoming.

 We find that the trial court properly applied Wyoming law as to elements necessary to "pierce the corporate veil" in the instructions given to the jury. The court's carefully crafted instructions on this issue followed Wyoming law. (Vol. VII Trial Transcript, pp. 91 et seq.).

3. The same ruling would be applicable in the case of the trial court's exclusion of any testimony by Mr. Speedie concerning a document which he had previously testified did not exist.

The limitation of liability issue was presented to the jury through appropriate "course of dealings" instructions. Defendants' argument concerning the instructions is based upon the prem-

The instructions followed the opinion of the Wyoming Supreme Court in *Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73 (Wyo.1982), and cases there discussed in connection with its decision. In *Amfac,* the court relied on its earlier ruling in *Opal Mercantile v. Tamblyn,* 616 P.2d 776, 778 (Wyo.1980) concerning the tests for piercing the corporate veil:

> "Ordinarily, a corporation is a separate entity distinct from that of individuals comprising it.... This is true although all or a majority of the stock is owned by a single individual.... However, in an appropriate case and in furtherance of public policy or the ends of justice, the doctrine will be disregarded...."

> \* \* \* \* \* \*

> "Each case involving the disregard of the separate entity doctrine must be governed by the special *facts* of that case...." (Emphasis of the Court) (616 P.2d at 778).

The *Amfac* court further noted that actual fraud is not necessary as a predicate for disregarding separate corporate existence: (645 P.2d at 79)

> "Fraud is, of course, a matter of concern in suits to disregard corporate fictions, but it is not a prerequisite to such a result, especially where there is gross undercapitalization and complete domination by the stockholders...."

> \* \* \* \* \* \*

> "Nor is actual intent to defraud necessary. It is sufficient if the refusal to recognize the fact of the identity of the corporate existence by the individual brings about an inequitable result."

The *Amfac* court emphasized that the corporate identity can not be used for the purpose of obtaining an unfair advantage over third parties:

ise that there must be an express, contractual waiver, an argument not supported by the evidence in the case. There was no evidence before the jury of a signed agreement limiting Halpert's liability—and therefore, there was no evidence of an express waiver of any kind. The court correctly instructed the jury on implied waiver.

"It is well established that even though the only purpose of incorporation is to insulate owners from personal liability for debts of the business, that alone will not warrant the piercing of the corporate veil. However, when this intent is coupled with the incorporation of a judgment-proof company, the courts have not hesitated to disregard the rule of limited liability to prevent injustice to third persons...."

\* \* \* \* \* \*

"One may challenge the corporate entity by showing that he has been the victim of some basically unfair device by which the corporate form of business organization has been used to achieve an inequitable result...." (645 P.2d at 81).

Under the evidence presented by plaintiff, the jury was entitled to find that on past occasions PSI had used its subsidiaries in a manner calculated to insulate assets from professional liability, and that it had done so in the case of Halpert. It acquired firms with cash flow problems for relatively small amounts of cash, seeking to acquire tax benefits in the form of operating loss and credit carryovers from former years. Its practice was to continue to operate the firm, generating just enough income to take advantage of the tax benefits, and then to merge the firms into PSI. After acquiring Halpert, it allowed professional liability insurance to lapse, assumed control of its operations and management and moved it in with another subsidiary. "PSI dominated the operations of Halpert to the extent that the two lack(ed) any separateness."[4] There was evidence that PSI grossly undercapitalized Halpert, and that all of its assets were sold to PSI or to other insiders during 1982 and 1983. As noted before, PSI planned to merge Halpert into PSI in 1982 and made a $300,000 capital contribution to Halpert on Decem-

ber 31, 1982. After this suit was filed in September, 1983, and within one month, PSI reversed the capital contribution and cancelled plans for the merger.

PSI financed Halpert in defending this action and sent its own attorneys and engineers to depositions during the course of discovery. PSI, through Halpert, sought to hide its relationship with Halpert, and planned to cause Halpert to file bankruptcy. By August, 1983 PSI had caused Halpert to close down its business and collect all accounts receivable, channeling these receivables to PSI in payment of alleged obligations. Because of these transfers, PSI decided to hold off bankruptcy action at least until September, 1984, for fear that these transfers were voidable preferences. When bankruptcy was filed, the only creditors listed were PSI itself, and the contingent claim of plaintiff.

Under this evidence and the instructions of the court, the jury was entitled to find that PSI acted as the alter ego of Halpert Associates and was therefore liable for damages in this action.[5]

### Bifurcation of Trial.

Defendants claim that the trial court erred in denying their Motion to Bifurcate the Trial without hearing any argument on the question. Defendants contend that the portion of the trial relating to piercing the corporate veil should have been separated from the trial on liability in order to prevent prejudice to PSI. Defendants believe that "(t)he prejudice wrought upon the Defendants by trying the issue of professional negligence with the issue of piercing the corporate structure is best exemplified by the ... punitive damages section contained in the Brief of Appellant." The short answer to this, of course, is the fact that the trial court did not instruct on punitive damages.

---

4. Finding of the Court, Order on Motions, May 3, 1985, p. 4. The findings of the Court were made upon evidence submitted in connection with the Motion to Dismiss. Similar evidence was introduced at trial of the case.

5. The case was submitted to the jury by special interrogatories. Interrogatory Five and its An-

swer were as follows: (Vol. X Record on Appeal, p. 4)

Q. "Do you find, by a preponderance of the evidence that defendant Professional Services Industries, Inc. (PSI) was the alter ego of defendant Halpert Associates, Inc.

A. "Yes."

The decision of whether a party will be prejudiced by the denial of a separate trial is left to the sound discretion of the trial court. In *Easton v. City of Boulder, Colo.*, 776 F.2d 1441, 1447 (10th Cir.1985), cert. den. 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986), this Court set out and followed the general rule:

> "The Federal Rules of Civil Procedure give district courts broad discretion in deciding whether to sever issues for trial and the exercise of that discretion will be set aside only if clearly abused."

Here, the record reflects that the trial court was clearly aware of all issues to be tried in this case, and the instructions were carefully drafted to separate the issue of professional negligence from the question of whether PSI acted as the alter ego of Halpert. There is no showing that there was any abuse of discretion in the denial of defendants' motion for bifurcation without a hearing.

*Statute of Limitations.*

Defendants contend that the effect of the statute of limitations should not have been submitted to the jury since plaintiff's claim was barred as a matter of law.

■ Plaintiff filed its complaint on September 16, 1983, and *not* on September 16, 1984, as defendants assert in their brief. Under the Wyoming Statute Sec. 1–3–107, a claim arising from errors or omissions in the rendering of licensed or certified professional services must be brought within the greater of the following times: within 2 years of the date of the act, error or omission, except that the action may be instituted not more than 2 years after discovery, if the claimant can establish that the error or omission was:

> "(A) Not reasonably discoverable within a two (2) year period; or
>
> (B) The claimant failed to discover the alleged act, error or omission within the two (2) year period despite the exercise of due diligence; ..."

The statute further provides that if the act, error or omission is discovered during the second year of the two year period, the time for commencing a lawsuit will be extended for an additional six months.

Plaintiff presented evidence that following the Halpert report, dated December 28, 1979, water problems did not arise until after September, 1981, but plaintiff did not discover the negligent nature of Halpert's report until March or April, 1982 when a special investigation of soil conditions was conducted by the firm of Dames & Moore. The complaint was filed 18 months later. Under Wyoming law, knowledge of an injury or harm, standing alone, is not discovery of the negligent act which would start the running of the statute of limitations. *Metzger v. Kalke*, 709 P.2d 414 (Wyo.1985). In *Metzger*, a medical malpractice action, which construed the provisions of Sec. 1–3–107, the Court ruled that:

> "In view of the specific language of Sec. 1–3–107(a) and the rationale behind the discovery rule generally, we hold that a plaintiff discovers an 'alleged act, error or omission' within the meaning of subsection (a)(iv) *when he learns that his harm resulted from the wrongful conduct of the defendants.* When such discovery occurs during the second year following the alleged wrongdoing, the limitation period for filing suit extends two and one-half years from the date of the alleged act." (709 P.2d at 419). (Emphasis supplied).

Under the evidence here, a classic question was presented for determination by the jury. The question was submitted under instructions presenting the law of Wyoming. There was no error.

*Punitive Damages.*

The plaintiff Eastridge Development Company contends that the trial court committed error by refusing to receive evidence to support a claim for punitive damages against PSI, and in refusing to instruct on punitive damages.[6]

In this connection, plaintiff relies upon evidence concerning PSI's manipulation of Halpert and its assets for its own benefit, and its conduct in attempting to hide its

---

6. Plaintiff wished to introduce evidence of PSI's net worth.

relationship to Halpert from the Court and plaintiff's counsel.

■ The trial court declined to enlarge the case with a claim for punitive damages upon the ground that the basic claim pertained to professional negligence:

"Gentlemen, in considering the offer of proof of the plaintiff, I think that the court must first recognize that the law basically abhors punitive damages. It does not favor them, in other words.

And such damages are recoverable, generally, in a court action such as where there is wanton and reckless disregard of the plaintiff's rights, malice, fraud, or criminal indifference to the consequences.

Now, I must say that I am not ignoring for one moment the affidavits that were presented to this court in error by Mr. Pfister. I think that there is evidence there of perjury, a criminal act.

On the other hand, the basic claim, I think, just really goes back to that of Eastridge versus Halpert and the professional liability claims.... I really can't think that they rise to a level of willful and wanton conduct.

The game that PSI apparently played with the books and records of Halpert I don't think does, either. I do think in another case in another time, you would really be exposed, I think, to the same thing Judge Richey in Washignton gave to the former Under–Secretary of Defense earlier this week for four years.

And I don't excuse that conduct for one minute.

But on the other hand, I just don't think that it warrants punitive damages in this particular case. I think it's relevant only to the issue of the alter-ego, in that sense only, but not as to basic liability." (Trial Transcript, Vol. V, pp. 134–136).

On appeal, plaintiff concedes that in the underlying case of professional negligence —*Eastridge v. Halpert*, there was no evi-

dence of any act which would rise to the level of willful and wanton misconduct. That of course was the case being tried. The issue between Eastridge and PSI concerned PSI's liability for the conduct of Halpert. In such a case, the liability of PSI could not exceed that which arose from Halpert's professional negligence. PSI's liability was derivative, because it was the alter ego of Halpert. Under these circumstances, there was no error in refusing evidence and failing to instruct on punitive damages.

### The Settlement of the Neosho Claim.

■ Prior to trial of this case, the Neosho Construction Company, the general contractor for site preparation work on the Eastridge Mall, filed suit against Price Development for additional compensation because the work and conditions it encountered at the site were not fully disclosed prior to initiation of the work. Included in the total claim of $1,028,000 were various cost items—such as $80,000 for mucky conditions in the detention basis area; $118,000 for encountering unanticipated rock; $118,000 for sums remaining unpaid under their contract; $600,000 for moving waste dirt; $30,000 for re-sloping contours because of improper drawings; $30,000 for the extra cost of water purchased from the City, etc. The special claims were eventually settled for $125,000 in the Spring of 1984, but the parties never designated or reached any understanding as to what portion of the settlement went to which damages.[7] Plaintiff offered the testimony of Rex Madsen, the attorney who negotiated the settlement, as an expert witness for the purpose of testifying that, *in his opinion*, of the total of $125,000 paid in settlement, $70,000 to $75,000 was paid to settle Neosho's claim for increased costs due to mucky conditions arising from unanticipated ground water problem.

Outside the presence of the jury, the Court questioned Mr. Madsen as to how he arrived at the $70,000 to $75,000 figure.

---

7. There were two parts to the settlement which was in the total amount of $243,000. $118,000 of this sum was for payments retained under the contract, and $125,000 of the total related to the remaining five claims regarding rock conditions, extra water costs, etc. (Trial Transcript Vol. II, p. 24.)

The witness admitted "that that is largely subjective just like any other value that is discussed in a settlement situation." (Trial Transcript, Vol. II, p. 29). The objection to the testimony of Madsen was sustained upon the ground that his opinion was only speculative.

Under the circumstances of this case, including the tentative and speculative nature of the witness' proposed testimony, we find that exclusion of such evidence was not an abuse of discretion on the part of the trial court.

*The Verdict.*

In summing up the case during closing argument, plaintiff's counsel requested the jury to return a verdict in the amount of $260,000.

In answering Interrogatories, the jury found that Halpert Associates was 80% negligent, that Eastridge Development Company, et al., was 20% negligent, and that Empire Laboratories was not negligent in any part. The jury then found that Eastridge had been damaged in the sum of $208,000, which was, incidentally, exactly 80% of the amount of damages which plaintiff claimed. After obtaining permission from the Court to interrogate the jurors, counsel for plaintiff learned that the jury had mistakenly deducted 20% from its verdict. Plaintiff then filed a Motion to Correct the Verdict, together with an affidavit and a transcript of a telephone interview with the Foreman of the Jury, Joseph Zigmond. The trial court found that Rule 606(b) did not preclude the court from interrogating the jury concerning its verdict for the possibility of discovering clerical errors, and the Rule did not prevent a juror from testifying that the verdict did not accurately reflect the decision of the jury. Under these circumstances, the trial court denied defendants' Motion to Strike the affidavit and entered judgment for the entire amount of the verdict, without a reduction of 20% for plaintiff's negligence, "since it (was) clear and undisputed that the jury, before returning the verdict, deducted that 20% from the intended verdict." (Order of June 24, 1985, p. 3, Vol. I Record.)

■ We find that the trial court properly amended the verdict to reflect the jury's true decision, and the amended verdict will be upheld. See *Trujillo v. Longhorn Mfg. Co., Inc.*, 694 F.2d 221, 226 (10th Cir.1982), where the court ruled that an augmentation of plaintiff's award was proper in order that the judgment conform to the court's intention.

The defendants also contend that the Court erroneously refused to reduce the judgment amount by the $15,000 which had been paid by Empire in settlement of plaintiff's claim against that company.

After the jury returned its verdict, the trial court examined Wyoming law and the Wyoming statute, Sec. 1–1–113 (1977) which provided that "(W)hen a release ... is given in good faith to one (1) or two (2) or more persons liable in tort for the same injury ... it reduces the claim against the others," to the extent of the amount paid in consideration for the release. The court noted that the Wyoming Supreme Court had not decided the issue, and examined cases from other jurisdictions, ultimately determining that the $15,000 payment would not be offset against the judgment in this action. The court's order was entered on June 24, 1985.

On August 1, 1985, the Wyoming court decided *Kirby Bldg. Systems v. Mineral Explorations*, 704 P.2d 1266 (Wyoming 1985). The *Kirby* case involved a building fire, and at least 9 defendants, some of whom settled out of the case before trial. The jury returned a special verdict apportioning fault among the defendants.

The total damages awarded by the jury in the *Kirby* case was $8,392,216.90. The trial court reduced this sum by $419,610.85 (for the 5% fault attributable to plaintiffs), and by the sum of $1,185,000 (the amount of all of the settlements). It is thus apparent that the court deducted the settlements paid by two of the parties, although the jury had found them to be without fault. The Wyoming Supreme Court held that the "trial judge calculated the judgment exactly as provided by the applicable statutes

and case law of the state of Wyoming." 704 P.2d at 1271. .

 Because of the decision of the Wyoming Supreme Court in the *Kirby* case, we will remand this action to the trial court solely for the purpose of reconsidering the question of whether the $15,000 settlement paid by Empire Laboratories in this action should be deducted from the verdict. The rulings, orders, and judgment of the court are in all other respects, AFFIRMED.

The case is REMANDED FOR FURTHER PROCEEDINGS in accordance with this opinion.