2012 WY 84

(1) BLACK DIAMOND ENERGY PARTNERS 2001–A LTD., (2) Black Diamond Energy Partners 2001 B–Ltd., (3) Black Diamond Energy Partners 2002 A–Ltd., (4) Black Diamond Energy Partners 2002 B–Ltd., (5) Black Diamond Energy Partners 2003 A–Ltd., (6) Black Diamond Energy Partners 2003 B–Ltd., (7) Black Diamond Energy Partners 2004 A–Ltd., (8) Black Diamond Energy Partners 2004 B–Ltd., (9) Black Diamond Energy Partners 2005 A–Ltd., (10) Black Diamond Energy Partners 2005 B–Ltd., (11) Black Diamond Energy Partners 2005 C–Ltd., (12) Black Diamond Energy Partners 2006 A–Ltd., (13) Black Diamond Energy Partners 2006 B–Ltd., (14)

Black Diamond Energy Partners 2007 A–Ltd., (15) Black Diamond Energy Partners 2007 B–Ltd., (16) Black Diamond Energy Partners 2008 A–Ltd., (17) Black Diamond Energy Partners 2008 B–Ltd., Appellants (Plaintiffs),

v.

S & T BANK, Appellee (Defendant).

No. S–11–0206.

Supreme Court of Wyoming.

June 15, 2012.

Representing Appellants: Greg L. Goddard of Goddard, Wages & Vogel, P.C., Buf-falo, Wyoming; Mark A. Waller of Sneed Lang Herrold PC, Tulsa, Oklahoma. Argument by Mr. Goddard.

Representing Appellee: Stuart R. Day and Ryan Schwartz of Williams, Porter, Day & Neville, P.C., Casper, Wyoming; John B. Joyce and Andrew G. Dittoe of Grenen & Birsic, P.C., Pittsburgh, Pennsylvania. Argument by Mr. Joyce.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] Black Diamond Energy Partners 2001–A Ltd., 2001–B Ltd., 2002–A Ltd., 2002–B Ltd., 2003–A Ltd., 2003–B Ltd., 2004–A Ltd., 2004–B Ltd., 2005–A Ltd., 2005–B Ltd., 2005–C Ltd., 2006–A Ltd., 2006–B Ltd., 2007–A Ltd., 2007–B Ltd., 2008–A Ltd., and 2008–B Ltd. (BDE Partners) are Nevada limited partnerships which own interests in coal bed methane wells located in Wyoming. Black Diamond Energy, Inc., (BDE, Inc.) is a Wyoming corporation and the managing general partner of BDE Partners 2001–A Ltd. through 2006–A Ltd. Black Diamond Energy, Inc. of Delaware (BDE Del) is a Delaware corporation and the managing general partner of BDE Partners 2006–B Ltd. through 2008–B Ltd. BDE, Inc. and BDE Del are wholly owned subsidiaries of Koval Resources, LLC (Koval Resources), a Nevada limited liability company.

[¶ 2] Koval Resources entered into a loan agreement in Pennsylvania with S & T Bank (S & T), a regional state bank with offices only in Pennsylvania. Koval Resources ultimately defaulted on the loan. BDE Partners filed a complaint in Wyoming against S & T alleging negligence, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing and other claims. S & T moved to dismiss the complaint, asserting Wyoming lacked personal jurisdiction because S & T did not have sufficient contacts with the State to establish personal jurisdiction. The district court granted S & T's motion. BDE Partners appealed, claiming the district court erred in concluding it did not have personal jurisdiction over S & T. We reverse.

## ISSUE

[¶ 3]   The issue for our determination is whether the district court correctly concluded it did not have personal jurisdiction over S & T.

## FACTS

[¶ 4]   BDE Partners are comprised of approximately 3800 limited partners and two general managing partners who reside in various states, including Pennsylvania and Wyoming.   BDE Partners own interests in approximately 430 coal bed methane wells located in Johnson, Converse, Sublette, Sweetwater, and Campbell counties in Wyoming.   BDE, Inc. owns 36% and/or 40% of BDE Partners 2001–A Ltd. through 2006–A Ltd. BDE Del owns 36% of BDE Partners 2006–B Ltd. through 2008–B Ltd. Charles and Eric Koval are the owners and principal officers and directors of Koval Resources, BDE, Inc. and BDE Del.

[¶ 5]   In 2002, Koval Resources and S & T entered into a loan agreement in Pennsylvania pursuant to which S & T agreed to extend a revolving line of credit to Koval Resources in the amount of $5,000,000.   The funds were to be used exclusively as working capital for Koval Resources operations.   Charles Koval, Eric Koval and their respective spouses individually guaranteed the loan and pledged their assets as collateral.   Additionally, BDE, Inc., acting as corporate guarantor for the loan, executed a guaranty and suretyship agreement with S & T providing that it would mortgage or assign certain oil and gas royalty interests it owned in Wyoming as collateral.

[¶ 6]   At the time the loan agreement was executed, the Kovals were residents of Pennsylvania and BDE, Inc.'s principal offices were located there as well.   The loan agreement and note provided that they were governed by and to be construed in accordance with Pennsylvania law and, in the event of a dispute, Koval Resources consented to the "non-exclusive jurisdiction" of a Pennsylvania court.   BDE, Inc.'s guaranty and surety agreement likewise provided that it was governed by Pennsylvania law and that BDE,

Inc. consented to the non-exclusive jurisdiction of the courts in Pennsylvania.

[¶ 7]   Shortly after the Koval Resources loan agreement and note were executed, BDE, Inc. entered into an escrow agreement pursuant to which partnership interests in BDE Partners 2002–B Ltd. would be offered for sale to qualified investors.   Proceeds from the sales were to be deposited in an escrow account opened with S & T, held in the account until they reached a specified amount and then released to BDE, Inc. Similar escrow agreements were executed in subsequent years for the sale of interests in BDE Partners 2003–A Ltd. through BDE Partners 2008–B Ltd.

[¶ 8]   Between 2002 and 2009, S & T and Koval Resources executed nine amendments to the original loan agreement and note.   In some instances, the amendments merely extended the term of the loan.   In other instances, the amendments also increased the principal amount of credit extended.   All of the amendments provided that they were governed by Pennsylvania law and Koval Resources consented to the nonexclusive jurisdiction of courts in Pennsylvania.   Between the fourth amendment in January of 2006 and fifth amendment a year later, two S & T senior vice presidents came to Wyoming where they met with BDE, Inc. employees and viewed BDE, Inc.'s assets and operations.

[¶ 9]   By May of 2007, when the original loan agreement was amended for the sixth time, S & T had extended credit to Koval Resources in the amount of $20,000,000. With that increase in the principal amount, BDE Del joined BDE, Inc. as a corporate guarantor of the line of credit extended to Koval Resources.   In September of 2007, S & T retained an independent petroleum engineer licensed in Wyoming to perform an evaluation of the reserves and economic value of BDE, Inc.'s oil and gas interests in three Wyoming counties.   Shortly thereafter, S & T loaned Koval Resources and BDE, Inc. $3,320,000 in a separate term loan.[1]   The promissory note evidencing the term loan provided that it was governed by federal law

---

1.   The record indicates S & T made other term loans to BDE, Inc. as well.

applicable to S & T and, to the extent not preempted by federal law, the law of Pennsylvania. It also provided that in the event of a lawsuit, BDE, Inc., and Koval Resources agreed upon S & T's request to submit to the jurisdiction of Pennsylvania courts.

[¶ 10] As collateral for the additional amounts loaned to Koval Resources and itself, BDE, Inc. executed new and amended agreements mortgaging additional oil and gas interests it owned in Wyoming and assigning interests it had in leases and pipelines located in Wyoming. Seven of the nine documents contained in the record evidencing BDE, Inc.'s mortgages or assignments of property provide that they are governed by Wyoming law; the remaining two provide they are governed by Pennsylvania law.

[¶ 11] In mid-January of 2008, BDE, Inc. and BDE Del each executed control agreements with S & T, whereby they granted S & T a security interest in and control over all of the BDE Partners. As with most of the other loan documents, the control agreements provided that they were governed by Pennsylvania law. Also in early 2008, BDE, Inc. began moving its offices from Pennsylvania to Wyoming. By late 2008, BDE, Inc. had completely relocated to Wyoming.

[¶ 12] Prior to the relocation, BDE, Inc. began experiencing cash flow and other financial problems and sold some of its Wyoming property. S & T approved the sale but advised that 100% of the proceeds would be applied to the outstanding loans. BDE, Inc. responded that it had other Wyoming properties it believed it could sell but would be obligated to distribute the proceeds of any such sales to its partners pursuant to the partnership agreements. BDE, Inc. expressed concern that S & T would delay sales and/or freeze the proceeds, leaving BDE, Inc. unable to pay BDE Partners in violation of the agreements. In response, S & T proposed that proceeds from sales of BDE, Inc. properties be payable to the bank in different percentages depending upon how the property had been designated[2] and that those percentages payable to S & T be applied either to the term loan debt or the line of credit. In the event the proceeds were applied to the line of credit, S & T advised BDE, Inc. that the availability of the funds would be reduced until the oil and gas reserves could be re-evaluated. In July of 2008, the Wyoming petroleum engineer hired by S & T completed another evaluation of BDE, Inc's Wyoming oil and gas reserves.

[¶ 13] BDE, Inc.'s financial condition continued to worsen and in the fall of 2008 its representatives met with S & T representatives in Pennsylvania to discuss the situation and request additional funding. In February of 2009, S & T's senior vice president came to Wyoming along with an oil and gas consultant hired by S & T to assess its collateral. They met with BDE, Inc. representatives, viewed its operations and property and traveled to Casper where they met with the petroleum engineer who had prepared the evaluations of BDE, Inc.'s reserves.

[¶ 14] Emails in the record reflect that communications between S & T and BDE, Inc., after S & T's February 2009 trip to Wyoming focused primarily on liquidating BDE, Inc.'s assets as a means of repaying the loans. In March of 2009, S & T's consultant visited Wyoming again to oversee the planned liquidation. Among his objectives during his stay were to review BDE, Inc.'s budget, determine what properties the company intended to keep and let go, meet with an oil and gas clearing house representative concerning potential interest in BDE, Inc.'s assets, discuss the company's salary plan and visit some of its key properties "to get a feel for the capital investment there in wells, infrastructure including pipelines, water treatments facilities, pipe lines, etc." S & T's consultant also indicated that BDE, Inc. needed to "identify an asset or assets that could be sold quickly ... [because] the bank has offered to work with you ... but you need to come up with some contribution to the effort from your side."

2.  Specifically, S & T proposed the following:

1) Sales of properties designated as "Proved Developed Producing" (PDP) S & T will require 65% of the proceeds.

2) Sales of properties designated "Proved Developed Non–Producing" (PDNP) S & T will require 20% of the sale proceeds.

3) All other acreage S & T will require 80% of $186.00 per acre or $149.00/acre.

[¶ 15]   After the consultant's trip to Wyoming, the parties attempted to negotiate a forbearance agreement.  In essence, the proposed agreement provided that S & T would refrain for three months from exercising its rights under the loan agreements and would make funds available during that time to fund Koval Resources and BDE, Inc.'s day to day operations, lease rental payments and accounts payable as approved by S & T. In exchange, Koval Resources and BDE, Inc. were to arrange for the orderly liquidation of their assets.  Ultimately, the negotiations broke down and the forbearance agreement was never executed.  In the summer of 2009, S & T filed a complaint in confession of judgment against BDE, Inc. in Pennsylvania for $19,434,348.07.  The Pennsylvania court entered judgment against BDE, Inc. in that amount and S & T filed the judgment as a foreign judgment in Wyoming.

[¶ 16]   In 2010, BDE Partners filed their complaint against S & T in Wyoming district court asserting in essence that S & T improperly interfered with BDE, Inc.'s ability to maintain its Wyoming operations, causing the operations to fail and BDE Partners to sustain damages.  S & T moved to dismiss the action asserting the Wyoming court lacked personal jurisdiction because S & T did not have even minimum contacts with Wyoming.  The district court granted the motion.

### STANDARD OF REVIEW

[¶ 17]   We have said many times:

The question of in personam jurisdiction is a mixed question of law and fact that, if disputed, must be resolved before a matter can proceed.  The district court has considerable leeway in deciding a pretrial motion to dismiss for lack of personal jurisdiction.  The court may determine the matter on the basis of pleadings and other materials called to its attention;  it may require discovery;  or it may conduct an evidentiary hearing.  The procedural path the district court chooses to follow determines the plaintiff's burden of proof and the standard to be applied on appeal.

When the underlying facts are undisputed, the existence of personal jurisdiction is a matter of law.  If the district court's determination is made without an evidentiary hearing, the plaintiff must show only a prima facie case to defeat the motion to dismiss.  The district court must view the allegations in the pleadings and documentary evidence in the light most favorable to the non-moving party, resolving all reasonable inferences in favor of the non-moving party.

When material factual allegations regarding jurisdiction in the affidavits cannot be harmonized, the district court should hold an evidentiary hearing to determine the issue of jurisdiction.  Once an evidentiary hearing is held, however, we will defer to the district court's findings of fact and the plaintiff will succeed upon showing, by a preponderance of the evidence, that the defendant is subject to jurisdiction.  No matter the procedural course charted, however, the ultimate question of whether personal jurisdiction can properly be exercised is a question of law to be reviewed de novo.

*Cheyenne Publishing, LLC v. Starostka,* 2004 WY 88, ¶ 10, 94 P.3d 463, 469 (Wyo. 2004) (citations omitted).

[¶ 18]   In support of its motion to dismiss for lack of personal jurisdiction, S & T submitted affidavits and exhibits.  In response, BDE Partners also submitted affidavits and exhibits.  The district court did not hold an evidentiary hearing;  rather, it decided S & T's motion based on the pleadings, the other materials the parties submitted and the legal arguments of counsel.  Given this course of proceedings, the district court was required to view the allegations in the pleadings and documentary evidence in the light most favorable to BDE Partners and resolve all reasonable inferences in its favor.  Applying this same standard, we review *de novo* the question of whether the district court had personal jurisdiction over S & T. *O'Bryan v. McDonald,* 952 P.2d 636, 638 (Wyo.1998).

### DISCUSSION

[¶ 19]   As we have said:

The courts of Wyoming are authorized by statute to exercise personal jurisdiction

over defendants on any basis which is not inconsistent with the Wyoming or United States constitutions. W.S. 5–1–107(a) (1977). So long as the exercise of jurisdiction does not offend the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the courts of this state have jurisdiction over a defendant. *Markby v. St. Anthony Hosp. Sys.,* 647 P.2d 1068, 1070 (Wyo.1982).

Due process requires that the defendant have certain "minimum contacts" with the forum state such that the exercise of jurisdiction over him does not offend "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Markby,* 647 P.2d at 1070.

*Amoco Prod. Co. v. EM Nominee Partnership Co.,* 886 P.2d 265, 267 (Wyo.1994).

▮ [¶ 20] For a plaintiff to meet its burden of making a prima facie showing that a defendant is subject to personal jurisdiction in Wyoming,

> [i]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

*Olmstead v. American Granby Co.,* 565 P.2d 108, 112 (Wyo.1977), citing *Cozzens v. Piper Aircraft Corp.,* 514 P.2d 1375, 1378 (Wyo. 1973) (emphasis added). A showing that a defendant had casual, isolated, or sporadic transactions of limited duration and extent within the forum state is not sufficient. *Olmstead,* 565 P.2d at 112. However,

> to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Ford Motor Co. v. Arguello,* 382 P.2d 886, 894 (Wyo.1963), quoting *Int'l Shoe,* 326 U.S. 310, 66 S.Ct. at 160.

[¶ 21] In addition to the above considerations, this Court has applied the following three part test to determine whether Wyoming has personal jurisdiction over a nonresident defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or of causing important consequences in that state. Second, the cause of action must arise from the consequences in the forum state of the defendant's activities. Finally, the activities of the defendant or the consequences of those activities must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Anderson v. Perry,* 667 P.2d 1155, 1157 (Wyo.1983); *Amoco,* 886 P.2d at 267. We have also adopted the United States Supreme Court's distinction between "general" and "specific" personal jurisdiction.

> "Specific" jurisdiction is when a state exercises jurisdiction over a defendant in a suit arising out of or related to that defendant's contacts with the forum. *Helicopteros Nacionales De Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872, n. 8, 80 L.Ed.2d 404 (1984); see *Eddy v. Oukrop,* 784 P.2d 610, 612–14 (Wyo.1989) (jurisdiction exercised over defendants because suit arose out of defendants' contacts with Wyoming). In contrast, "general" jurisdiction is when a state exercises jurisdiction over the defendant in a suit not arising out of or related to that defendant's contacts with the state. *Helicopteros Nacionales,* 466 U.S. at 414 n. 9, 104 S.Ct. at 1872 [n. 9]; see *Markby,* 647 P.2d at 1074 (defendant's contacts with the state not sufficient to create personal jurisdiction in Wyoming where defendant's contacts with the state were not related to the suit). Even if a single act arises out of or is related to the suit, a state may not have jurisdiction if the nature of the act creates only an "attenuated" connection with the forum. *Burger King [v. Rudzewicz],* 471 U.S. [462], at 475 n. 18, 105 S.Ct. [2174], at 2184 n. 8 [85 L.Ed.2d 528] [ (1985) ].

*Amoco,* 886 P.2d at 267–268.

[¶ 22] To illustrate, in *Markby,* the plaintiff filed a wrongful death suit in Wyoming

against a Colorado hospital claiming it failed to properly care for the decedent, a Wyoming resident, while she was a patient at the hospital in Colorado. The hospital's only contact with Wyoming was placing an advertisement in Wyoming telephone directories for its air ambulance service. This Court concluded Wyoming did not have personal jurisdiction over the hospital because the wrongful death action did not result from and was not related in any way to the hospital's only activity in Wyoming—advertising its air ambulance service.

[¶ 23] In contrast, in *Eddy,* the defendant entered into a contract in Wyoming and his alleged breach of the contract gave rise to the lawsuit. The Court held that Wyoming had jurisdiction over the defendant in part based on the fact that his activity in Wyoming—entering into a contract here—gave rise to the lawsuit. Similarly, in *Amoco,* the plaintiff brought suit in Wyoming claiming the defendant breached an oil and gas unit agreement when it refused to reimburse Amoco for royalties it had mistakenly paid to the defendant. The defendant's only contacts with Wyoming were that it owned real property (its overriding royalty interest) in Wyoming and became a party to the unit agreement in Wyoming when it purchased the royalty interest. Because the lawsuit arose out of one of the defendant's contacts with Wyoming—the unit agreement, which Amoco claimed it breached—the Court concluded Amoco was asserting specific jurisdiction.

[¶ 24] The *Amoco* Court went on to apply the three part test for determining whether the defendant's contacts with Wyoming were sufficient for the courts to exercise personal jurisdiction over it. Addressing the first requirement, the Court concluded the defendant purposefully availed itself of the privilege of acting in Wyoming when it purchased property here and accepted the benefits of that ownership in the form of royalty payments that were earned based on oil and gas production in the State. The Court rejected the argument that passive ownership of property is insufficient to justify the exercise of jurisdiction and concluded that jurisdiction based upon a contract is proper in Wyoming

when the contract has consequences in Wyoming.

[¶ 25] Addressing the second part of the test, the Court reiterated that the cause of action involved specific personal jurisdiction; it arose out of the unit agreement to which the defendant was a party and was related to the defendant's ownership of the royalty interest. Thus, the cause of action arose as a consequence of the defendant's activities in Wyoming. The Court further concluded the defendant's activities had a substantial connection with Wyoming, thus meeting the third requirement for personal jurisdiction. "[T]he contract [to which the defendant is a party] concerns a royalty interest located in Wyoming, which earned [the defendant] substantial amounts of money on oil and gas produced in this state." *Amoco,* 886 P.2d at 269. Moreover, the Court concluded, the exercise of jurisdiction by Wyoming was reasonable because the State has a strong interest in its natural resources and their production. *Id.*

[¶ 26] Another Wyoming case warrants discussion. In *Anderson,* 667 P.2d at 1157, the Court concluded Wyoming had personal jurisdiction over a non-resident defendant who was being sued after he defaulted on payments under a contract for the purchase of real estate in Wyoming. In concluding that the defendant had purposefully availed himself of the privilege of acting in Wyoming for purposes of due process, the Court cited as support two cases of note from other jurisdictions. *Id.* at 1157–1158. In *Waterval v. District Court In and For El Paso County, Colo.,* 620 P.2d 5 (1980), the defendant had never been in Colorado; his contacts consisted of investment advice given by telephone over a two-year period. The court concluded those contacts adequately demonstrated a purposeful election to cause important consequences in the forum state. The court stated:

> His was not a single, isolated act, the effects of which occurred fortuitously in this state. Nor was [his] contact with the forum state thrust upon him against his will. Rather, [he] freely and deliberately chose to continue in Colorado his attorney-

client relationship which originated in Virginia.

*Id.* at 11. In *Proctor & Schwartz, Inc. v. Cleveland Lumber Co.*, 228 Pa.Super. 12, 323 A.2d 11 (1974), the defendant corporation had no offices, property, agents, representatives or employees in the forum state and the contract giving rise to the suit was signed in a different state and was the only business contact the defendant had with the forum state. Still, given the other circumstances, the court found it reasonable that the defendant should have foreseen that the transaction would have consequences in the forum state.

[¶ 27] Relying on these cases, the Court concluded in *Anderson* that the defendant's activities had a substantial enough connection with Wyoming to make the exercise of jurisdiction reasonable. The Court found it important that the contract at issue involved real property located in Wyoming and covenants recorded in Wyoming. Borrowing words from another Colorado decision, the Court found it of "utmost importance" that the subject matter of the contract, the real estate, was located in Wyoming, thereby making Wyoming the state with the greatest interest in the transaction. *Anderson*, 667 P.2d at 1158, citing *Dwyer v. District Court, Sixth Judicial District, Colo.*, 188 Colo. 41, 532 P.2d 725 (1975).

[¶ 28] Similarly, in *First Michigan Bank v. Mueller*, No. 11–10975, 2011 WL 3320524, 2011 U.S. Dist. LEXIS 84888, (E.D.Mich. Aug. 2, 2011) the court dismissed an action brought in Michigan by a Michigan bank that had extended five loans to out of state businesses. Because none of the loans facilitated businesses in Michigan, the court concluded the exercise of personal jurisdiction in Michigan was not appropriate. *See also, Lachman v. Bank of Louisiana*, 510 F.Supp. 753 (D.Ohio 1981), in which the court held it had personal jurisdiction in an action brought by an Ohio resident against a Louisiana bank where the credit arrangement was entered into in Louisiana, the debtor notified the bank of her move to Ohio, and the bank continued to extend credit to her in Ohio and billed her at her Ohio address for purchases made in Ohio.

[¶ 29] With these cases in mind, we turn to consideration of the present case. The activities BDE Partners asserts S & T engaged in that were connected to or had consequences in Wyoming include the following:

— extending millions of dollars in credit to Koval Resources and BDE Partners' general managing partner for use exclusively in establishing and maintaining their operations and assets in Wyoming;

— accepting as collateral for the loans BDE, Inc. property located exclusively in Wyoming, property in which BDE Partners owned an interest;

— controlling through security interests and control agreements BDE, Inc.'s ability to sell property located in Wyoming in which BDE Partners owned an interest in order to free up cash for use in maintaining BDE, Inc.'s Wyoming operations and paying BDE Partners;

— limiting BDE, Inc.'s ability to access the proceeds of sales of Wyoming property to pay expenses necessary to keep its Wyoming operations going, including Wyoming lease rentals, surface use fees, taxes, utility bills and employee salaries, and thereby pay amounts owed to BDE Partners;

— refusing to allow BDE, Inc. to use funds held in Charles Koval's wealth management account to run its Wyoming operations;

— requiring BDE, Inc. to liquidate its assets rather than taking action to assist it in maintaining its Wyoming operations and thereby pay BDE Partners;

— failing to take BDE Partners' ownership interests into account in liquidating BDE, Inc.'s Wyoming operations;

— requiring BDE, Inc. to turn its Wyoming operations over to a third party restructuring officer; and

— freezing all of BDE, Inc.'s bank accounts and line of credit without notice when $900,000 was available on the line of credit which directly impacted its Wyoming operations.

As a result of these activities and others by S & T, BDE Partners asserts BDE, Inc. was unable to keep the Wyoming operations going, defaulted on its loans and was unable to pay BDE Partners monies owing to them. In engaging in the above activities, BDE Partners assert among other claims that S & T acted negligently, breached its fiduciary duties and the covenant of good faith and fair dealing, and interfered with BDE Partners' contractual relations, business expectancy and prospective economic advantage.

[6] [¶ 30] Viewing the allegations in the pleadings and documentary evidence in the light most favorable to BDE Partners and resolving all reasonable inferences in its favor as we are required to do, we conclude BDE Partners met its burden of showing that S & T had sufficient contacts with Wyoming to warrant the exercise of personal jurisdiction by Wyoming courts. As has been true in other cases addressing personal jurisdiction, the basic facts upon which BDE Partners relies to show that S & T engaged in activities connected to or having consequences in Wyoming are not in dispute, only their characterization and application to the law. *Meyer v. Hatto*, 2008 WY 153, ¶ 15, 198 P.3d 552, 555 (Wyo.2008). It is undisputed, for example, that S & T extended millions of dollars in credit to Koval Resources and BDE, Inc. for their use exclusively in establishing and maintaining their Wyoming operations and assets and that S & T accepted as collateral for the loans property located exclusively in Wyoming. It also is undisputed that through security interests and control agreements S & T controlled BDE, Inc.'s ability to sell property located in Wyoming. The record likewise contains evidence that S & T: controlled BDE, Inc.'s ability to access the proceeds of sales of Wyoming property to pay expenses incurred in Wyoming in order to maintain its operations, such as Wyoming lease rentals, surface use fees, taxes, utility bills and employee salaries; hired a consultant and sent him to Wyoming to oversee on its behalf the liquidation of BDE, Inc.'s Wyoming assets; required BDE, Inc. to turn its Wyoming operations over to a third party restructuring officer; and denied BDE, Inc. access to bank accounts and the line of credit to operate its Wyoming properties.

[¶ 31] Applying the three part test for determining personal jurisdiction, we conclude from these activities that BDE Partners presented sufficient evidence that S & T purposefully availed itself of the privilege of acting in Wyoming or of causing important consequences here. BDE Partners' suit is based upon activities which had substantial connections with Wyoming. S & T purposefully and voluntarily elected to accept as collateral property located in Wyoming and the payments S & T received on the loans were earned in Wyoming based on oil and gas operations here. It is reasonable under these circumstances that S & T should have foreseen there would be consequences here.

[¶ 32] We further conclude the cause of action arose from the consequences of S & T's activities in Wyoming. In its dealings with Koval Resources and BDE, Inc., S & T accepted as collateral property located exclusively in Wyoming. All of the money loaned was used as working capital for BDE, Inc.'s Wyoming operations. S & T received payments on the loans from money earned in Wyoming, visited Wyoming to inspect the property, employed a Wyoming petroleum engineer to evaluate the property, exercised control over whether the property could be sold, received and held the proceeds from such sales, and employed a consultant to come to Wyoming to oversee liquidating the property.

[¶ 33] Finally, we conclude S & T's activities had a substantial enough connection to Wyoming to make the exercise of jurisdiction by Wyoming courts reasonable. All of the collateral for the loan agreements was located in Wyoming, thereby making Wyoming the state with the greatest interest in the transaction. The collateral consisted of oil and gas interests located in Wyoming in which the State has a strong interest. As we have said before,

> [we] realize that the factors to be weighed must, of necessity, be somewhat subjective. However, under the circumstances of this case, we find that it is reasonable and fair to require defendant to submit to the jurisdiction of a Wyoming court.

*Anderson*, 667 P.2d at 1159.

[¶ 34] In reaching this result, it is important to note that the claims before us are not

between the borrower, Koval Resources, and the lender, S & T, based on the loan documents negotiated and executed in Pennsylvania. In that context, S & T's arguments against the exercise of personal jurisdiction in Wyoming may well have been persuasive. This case, however, was brought by BDE Partners, who were not parties to the Pennsylvania loan agreements, against S & T for actions it took with respect to property located in Wyoming which, they claim, adversely and improperly affected their financial interests. In that context, and in light of the undisputed facts concerning S & T's activities in Wyoming, we conclude the exercise of personal jurisdiction is appropriate in Wyoming. In reaching the conclusion that personal jurisdiction is proper in Wyoming, however, we have not considered the substantive merits of BDE Partners' claims. Our holding is limited solely to the determination that BDE Partners presented sufficient undisputed evidence that S & T's activities in Wyoming were such that, as a matter of law, Wyoming courts have personal jurisdiction to decide their claims.

[¶ 35] We reverse and remand to district court for further proceedings consistent with this opinion.