# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 74

APRIL TERM, A.D. 2020

June 12, 2020

H&P ADVISORY LIMITED, a United
Kingdom private limited company,

Appellant
(Plaintiff),

v.

S-19-0250

RANDGOLD RESOURCES LIMITED, a
Jersey corporation and BARRICK GOLD
CORPORATION, a Canada corporation,

Appellees
(Defendants).

*Appeal from the District Court of Teton County*
*The Honorable Timothy C. Day, Judge*

*Representing Appellant:*
> Paul J. Hickey and Quinton Larsen Parham, Hickey & Evans, LLP, Cheyenne, Wyoming.

*Representing Appellee:*
> Kim D. Cannon, Davis & Cannon, LLP, Sheridan, Wyoming; Thomas J. McCormack and Victoria V. Corder, Norton Rose Fulbright US, LLP, New York, New York.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**BOOMGAARDEN, Justice.**

[¶1]    H&P Advisory Limited, a United Kingdom private limited company, appeals the district court's order dismissing its complaint against Randgold Resources Limited, a Jersey (Channel Islands) corporation, and Barrick Gold Corporation, a Canada corporation (Appellees), for lack of personal jurisdiction.  H&P argues the undisputed facts support personal jurisdiction over Appellees in Wyoming.  Because we conclude those facts and all reasonable inferences in H&P's favor do not support personal jurisdiction over Appellees in Wyoming in this contract dispute, we affirm.

### ISSUE

[¶2]    Whether H&P made the required prima facie showing that Appellees are subject to specific personal jurisdiction in Wyoming.

### FACTS[1]

[¶3]    Randgold and Barrick, two of the world's largest gold mining companies, unsuccessfully attempted merger several times.  Ian Hannam, H&P's founder, learned of these attempts through his friendships with Mark Bristow and John Thornton, the operational chiefs of Randgold and Barrick, respectively.  Seeing an opportunity to help Randgold and Barrick merge, Mr. Hannam contacted Mr. Thornton in early 2018 to propose a renewed round of merger talks between the companies.  Mr. Thornton agreed, stating Barrick and Randgold needed Mr. Hannam's "creativity and inspiration[.]"  He suggested Mr. Hannam broker the deal.  H&P served as a neutral broker between the two companies through March.

[¶4]    In early April, Mr. Thornton and Mr. Bristow agreed Mr. Hannam's role should transition to Randgold's independent advisor.  Mr. Thornton asked Mr. Hannam to brief Michael Klein, the founder of the investment bank M. Klein & Company, who would independently advise Barrick.  Mr. Hannam did so at Mr. Klein's New York office on April 3 and 4, 2018.

[¶5]    Two weeks later, Mr. Bristow suggested those involved in the merger meet in Jackson, Wyoming to participate in a series of negotiations at his personal, part-time residence.  Mr. Hannam, Mr. Bristow, Mr. Thornton, and Mr. Klein all traveled to Wyoming for that purpose.  While in Wyoming, Mr. Hannam proposed to Mr. Bristow a fee structure for H&P's work (the Fee Agreement):

---

[1] Given the standard of review, *see Black Diamond Energy Partners 2001-A Ltd. v. S & T Bank*, 2012 WY 84, ¶ 17, 278 P.3d 738, 742 (Wyo. 2012), we recite the facts in the light most favorable to H&P.

in exchange for H&P's advisory services in the course of brokering, negotiating and consummating the Merger, Randgold would compensate H&P as advisor and broker at closing with a fee not less than $10 million, which was 0.1 percent of the then-contemplated value of the transaction. The parties further agreed that the $10 million minimum would be subject to a pro rata upward adjustment if the value of the Merger increased, and that H&P's fee would be at least as high as the fee paid to M. Klein & Company, which advised Barrick in connection with the Merger. The parties also agreed that H&P would be eligible to receive a discretionary fee in addition to the fee agreed under these terms.

Mr. Bristow agreed to these terms.[2]

[¶6]    Mr. Bristow and Mr. Thornton also reached an agreement in principle for the merger while in Wyoming. However, Mr. Klein proposed renegotiating that agreement shortly after he left Wyoming. Mr. Hannam took issue with Mr. Klein's proposed terms and worked with other H&P employees over the next five months to negotiate a structural change to the merger. That change increased the merger's value "to approximately $18 billion."

[¶7]    Randgold and Barrick announced the merger in September 2018 but did not list H&P as an advisor. H&P sent Randgold an invoice for $18 million plus expenses shortly thereafter. Randgold refused to pay the invoice, saying it had no knowledge of its requirement to pay H&P's fee. Instead, Randgold offered to pay H&P a "small fee" for its role in the merger.

[¶8]    H&P sued Randgold and Barrick on February 26, 2019,[3] in the Ninth Judicial District in and for Teton County, Wyoming. It alleged breach of contract and, in the alternative, unjust enrichment. Appellees moved to dismiss, arguing in relevant part the district court lacked personal jurisdiction over them. The district court dismissed H&P's complaint on personal jurisdiction grounds.

## STANDARD OF REVIEW

[¶9]    We review a dismissal for lack of personal jurisdiction on undisputed facts de novo. *State v. Moody's Investors Serv.*, 2015 WY 66, ¶ 11, 349 P.3d 979, 982–83 (Wyo. 2015).

---

[2] Randgold's Chief Financial Officer later ratified the Fee Agreement's terms during a meeting with Mr. Hannam at H&P's London office.

[3] H&P asserts that following the merger Barrick succeeded to Randgold's liabilities, including Randgold's obligation to H&P.

Because the district court made its determination without an evidentiary hearing, H&P "must show only a prima facie case to defeat the motion to dismiss." *Id.* ¶ 11, 349 P.3d at 982 (quoting *Black Diamond*, ¶ 17, 278 P.3d at 742). In determining whether H&P carried its burden, we view the allegations in the pleadings and documentary evidence brought to the district court's attention in the light most favorable to H&P and resolve all reasonable inferences in H&P's favor. *Id*. ¶ 11, 349 P.3d at 982–83.

## *DISCUSSION*

[¶10] Wyoming's long-arm statute authorizes this State's courts to exercise personal jurisdiction "on any basis not inconsistent with the Wyoming or United States constitution." Wyo. Stat. Ann. § 5-1-107(a) (LexisNexis 2019). "The Due Process Clause of the Fourteenth Amendment to the United States Constitution operates as a limitation on the jurisdiction of state courts to enter judgments affecting rights or interests of nonresident defendants." *Moody's*, ¶ 13, 349 P.3d at 983 (quoting *O'Bryan v. McDonald*, 952 P.2d 636, 638 (Wyo. 1998)); *see also Woodie v. Whitesell*, 2019 WY 115, ¶ 16, 451 P.3d 1152, 1157 (Wyo. 2019) (citing *Black Diamond*, ¶ 19, 278 P.3d at 743). "Due process requires that the defendant[s] have certain 'minimum contacts' with the forum state such that the exercise of jurisdiction over [them] does not offend 'traditional notions of fair play and substantial justice.'" *Black Diamond*, ¶ 19, 278 P.3d at 743 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945)). In other words, the Due Process Clause protects Appellees' "liberty interest in not being subject to the binding judgments of a forum with which [they have] established no meaningful 'contacts, ties, or relations.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) (quoting *Int'l Shoe*, 326 U.S. at 319, 66 S.Ct. at 160).

[¶11] The foundational criteria against which we measure Appellees' contacts, ties, and relations with Wyoming are well established:

> the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. ***Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.*** That clause does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties, or relations.

But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Int'l Shoe*, 326 U.S. at 319, 66 S.Ct. at 159–60 (emphasis added) (citations omitted). In applying these foundational criteria, "[w]e have adopted the United States Supreme Court's distinction between 'general' and 'specific' personal jurisdiction[.]"[4] *Moody's*, ¶ 14, 349 P.3d at 983; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn. 8–9, 104 S.Ct. 1868, 1872, nn. 8–9, 80 L.Ed.2d 404 (1984); and *Burger King*, 471 U.S. at 475 n.18, 105 S.Ct. at 2184 n.18. H&P argues only with respect to specific personal jurisdiction, so we limit our review accordingly.

[¶12] We apply a three-part test to determine whether the quality and nature of Appellees' Wyoming activity was of the type necessary to support specific personal jurisdiction. First, Appellees must have purposefully availed themselves of the privilege of acting in Wyoming or of causing important consequences in Wyoming.[5] *Moody's*, ¶ 15, 349 P.3d at 983 (citing *First Wyoming Bank, N.A. Rawlins v. Trans Mountain Sales & Leasing, Inc.*, 602 P.2d 1219, 1221 (Wyo. 1979)). Second, H&P's cause of action must arise from consequences in Wyoming of the Appellees' activities. *Id.* Finally, the Appellees' activities or the consequences of those activities must have a substantial enough connection with Wyoming to make the exercise of jurisdiction over Appellees reasonable. *Id.*

[¶13] H&P relies on facts showing it entered into the Fee Agreement in Wyoming and partially performed under that Fee Agreement while in Wyoming as its prima facie case

---

[4] In *Moody's*, ¶ 14, 349 P.3d at 983, we explained that:

"Specific" jurisdiction is when a state exercises jurisdiction over a defendant in a suit arising out of or related to that defendant's contacts with the forum. . . . In contrast, "general" jurisdiction is when a state exercises jurisdiction over the defendant in a suit not arising out of or related to that defendant's contacts with the state.

(quoting *Amoco Prod. Co. v. EM Nominee Partnership Co.*, 886 P.2d 265, 267–68 (Wyo. 1994)).

[5] H&P does not argue Appellees purposefully availed themselves of the privilege of causing important consequences in Wyoming.

that parts one and two of the three-part test are satisfied.[6]  Relevant to these points, H&P's complaint and Mr. Hannam's affidavit state:

- Mark Bristow, then the Chief Executive Officer of Randgold, requested that [Mr. Hannam] travel to Jackson, Wyoming, where [Mr. Bristow] lives part-time, to prepare for and participate in a more intensive series of merger discussions with representatives of Barrick.

- At the conclusion of their meetings in Wyoming, Bristow and Thornton had reached an agreement in principle for the Merger.  Hannam was the source of and chief advocate for the structure of that agreement in principle, under which neither company's shareholders would receive a premium over the market value of their equity (sometimes referred to as a "nil premium" merger).

- [After the Wyoming meetings,] while Hannam was still in Wyoming for further meetings with Bristow, Klein called Hannam and informed him that—contrary to the terms of the companies' agreement in principle—Barrick would not accept the Merger unless a substantial discount was applied to the market value of Randgold's equity.  Hannam informed Klein that this was not the deal the parties had discussed.

- H&P's claim for breach of contract arises from an agreement [in principle] that principals of H&P and Randgold negotiated and entered into in Wyoming.

- A significant part of the valuable services that form the basis for H&P's unjust enrichment claim was rendered—and accepted—in Wyoming.

[¶14]  We first consider whether these facts and the reasonable inferences they support show that Appellees purposefully availed themselves of the privilege of acting in Wyoming.  "Purposeful availment is a threshold requirement meant to ensure 'that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts.'"  *Meyer v. Hatto*, 2008 WY 153, ¶ 16, 198 P.3d 552, 555 (Wyo.

---

[6] If H&P makes a prima facie showing on parts one and two, then the burden of proof on part three shifts to Randgold and Barrick.  *See Cheyenne Publ., LLC v. Starostka*, 2004 WY 88, ¶ 13, 94 P.3d 463, 472 (Wyo. 2004) (citing 4 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 3d* § 1067.6 at 523–67 (2002 and Pocket Part 2003)); *see also Amoco*, 886 P.2d at 267.

5

2008) (quoting *Goodwin v. Hall*, 957 P.2d 1299, 1301 (Wyo. 1998)).  "Even if a single act arises out of or is related to the suit, a state may not have jurisdiction if the nature of the act creates only an 'attenuated' connection with the forum."  *Moody's*, ¶ 14, 349 P.3d at 983 (quoting *Amoco*, 886 P.2d at 268).

[¶15]   When, as here, the underlying dispute is contractual in nature,[7] personal jurisdiction cannot turn on attenuated connections "or on 'conceptualistic . . . theories of the place of contracting or of performance[.]'"  *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316, 63 S.Ct. 602, 605, 87 L.Ed. 777 (1943)).  Instead, we must employ

> a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction."  It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the [Appellees] purposefully established minimum contacts within [Wyoming].

*Id.*, 471 U.S. at 479, 105 S.Ct. at 2185 (citation omitted).

[¶16]   Our decision therefore cannot turn on H&P's conceptual theory that the Ninth Judicial District has specific personal jurisdiction over Appellees because H&P entered into the Fee Agreement and partially performed under that agreement in Jackson, Wyoming.  We must evaluate the real object of the Fee Agreement—the merger—and the parties' actual course of dealing to determine whether Appellees purposefully established minimum contacts within Wyoming as H&P contends.  *See id.*  When making this determination, we have considered the following nonexclusive factors: the residency of each party at the time of contracting; the location of future performance detailed by the contract; whether defendants voluntary owned property or a property interest in Wyoming; whether defendants incurred obligations in Wyoming; and whether defendants have offices, property, agents, representatives, or employees in Wyoming.  *See generally Black Diamond*, ¶¶ 22–28, 278 P.3d at 743–45; *Amoco*, 886 P.2d at 268; *Eddy v. Oukrop*, 784 P.2d 610, 612 (Wyo. 1989); *Anderson v. Perry*, 667 P.2d 1155, 1157–58 (Wyo. 1983); *see*

---

[7] H&P pleaded breach of contract and, "[s]olely in the alternative[,]" unjust enrichment.  We acknowledge that H&P's unjust enrichment claim is legally distinct from its breach of contract claim; however, because both claims rely on the same facts—H&P's performance to consummate the merger—we consider both claims to be contractual in nature.  *See Cross v. Berg Lumber Co.*, 7 P.3d 922, 933 (Wyo. 2000) (citing G. Palmer, *Law of Restitution* § 1.1 at 2 (1978) (footnotes omitted)) ("Restitution based upon unjust enrichment cuts across many branches of the law, including contract, tort, and fiduciary relationship, but it also occupies much territory that is its sole preserve.").

*also Cricket Group, Limited v. Highmark, Inc.*, 198 F.Supp.3d 540, 544 (D. Md. 2016) (citation omitted) (noting courts also consider "whether the parties contractually agreed that the law of the forum state would govern disputes," and "the nature, quality and extent of the parties' communications about the business being transacted").

[¶17]  The reality is that the Fee Agreement and the services H&P rendered under that agreement while in Wyoming were inextricably related to prior and future business negotiations and future consequences involving two foreign gold companies and two foreign brokers in Jersey, Canada, the United Kingdom, and New York.  Nothing in the Fee Agreement required H&P to perform advisory services in Wyoming.  The terms of the oral Fee Agreement as represented by H&P in its pleadings and Mr. Hannam's affidavit did not address a choice of law or any other provision tying future performance or obligations to Wyoming.  Moreover, nothing connected H&P's compensation under that agreement to Wyoming.  The Fee Agreement instead acknowledged on-going negotiations and potential fee adjustments based on the fees Randgold would pay M. Klein & Company (the non-resident broker advising Randgold) and the exercise of Barrick's unconditioned discretion.

[¶18]  Further considering the parties and their actual course of dealing, the undisputed facts make clear neither Randgold nor Barrick maintain offices, hold property, or are incorporated in Wyoming.  The pleadings are silent on any contact with Wyoming except for the Fee Agreement discussion and several days' meetings in Jackson at Mr. Bristow's invitation.  Although Mr. Bristow invited the parties to attend meetings and negotiations in Wyoming, those activities, including orally agreeing to H&P's fees, represented "but an intermediate step serving to tie up prior business negotiations with future consequences," none of which were expected to or did occur in Wyoming.  *Burger King*, 471 U.S. at 479, 105 S.Ct. at 2185 (citation omitted); *cf. Eddy*, 784 P.2d at 612.  Ratification of the Fee Agreement and all other communications, meetings, and performance under that agreement (or nonperformance as it concerns H&P's compensation), occurred elsewhere.  Because H&P's causes of action lie in contract, and because Wyoming has no more connection with that contract than the place of contracting and partial performance, H&P failed to make a prima facie case for Appellees' purposeful availment.  *See Burger King*, 471 U.S. at 478–82, 105 S.Ct. at 2185–87.

[¶19]  For the same reasons, H&P failed to carry its prima facie burden on the second requirement—to show that its breach of contract and unjust enrichment claims arise from consequences in Wyoming of Appellees' actions.  *See Moody's*, ¶ 15, 349 P.3d at 983.  The merger concerned only nonresident entities and property, and nothing in the pleadings or Mr. Hannam's affidavit tie H&P's claims to consequences in Wyoming of Appellees' limited activities while in Jackson.  To the contrary, the pleadings and Mr. Hannam's affidavit show that H&P's continued performance under the Fee Agreement after leaving Wyoming led to a substantial change in the ultimate merger structure.  The consequences of these changes—including the calculation of H&P's fees and Randgold's ultimate failure

to pay those fees—occurred outside Wyoming when the deal closed. Therefore, breach of that agreement, as well as any unjust enrichment, was not a consequence in Wyoming of Appellees' Wyoming activities. *See id.*

[¶20] Because H&P failed to make a prima facie showing that Appellees purposefully availed themselves of the privilege of acting in Wyoming, or that its cause of action arose from the consequences in Wyoming of Appellees' Wyoming activities, the district court correctly concluded it lacked specific personal jurisdiction over Appellees.

[¶21] Affirmed.